UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 15-319 RS |
| | ) | |
| CARL MARK FORCE, IV, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Monday |
| | ) | October 19, 2015 |
| _____ | ) | 2:05 p.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          BRIAN STRETCH
                        Acting United States Attorney
                        450 Golden Gate Ave.
                        San Francisco, California  94102
                BY:     KATHRYN HAUN
                        WILLIAM FRENTZEN
                        Assistant United States Attorneys
                        and
                        United States Department of Justice
                        Criminal Division
                        public integrity section
                        Bond Building, 1400 New York Ave. N.W.
                        Washington, D.C., 20005
                BY:     RICHARD EVANS


Reported by  BELLE BALL, CSR 8785,  CRR, RDR
          Official Reporter, U.S. District Court


(Appearances continued, next page)

APPEARANCES, CONTINUED:


For Defendant:          LAW OFFICE OF LOYST P. FLETCHER
                        500 South Grand Avenue
                        19th Floor
                        Los Angeles, California  90071
                   BY:  LOYST P. FLETCHER, ESQ.
                        and
                        LAW OFFICE OF IVAN JULES BATES
                        201 N. Charles St. Suite 1900
                        Baltimore, MD 21201
                   BY:  IVAN JULES BATES, ESQ.

Also Present:           KYLE POLLAK
                        U.S. Probation

**MONDAY, OCTOBER 19, 2015**                                    **2:05 P.M.**

<u>P R O C E E D I N G S</u>

**THE CLERK:**  Calling Case CR-15-319, United States versus Carl Mark Force.

(Defendant present)

**THE CLERK:**  Counsel, please come forward and state your appearances.

**MS. HAUN:**  Good afternoon, Your Honor.  Kathryn Haun for the United States.  And I'm joined here by my colleagues, Mr. Richard Evans of the Public Integrity Section of the Justice Department, and Mr. Will Frentzen of the U.S. Attorney's office.

**THE COURT:**  Good afternoon.

**MR. EVANS:**  Good afternoon, Your Honor.

**MR. FRENTZEN:**  Good afternoon, Your Honor.

**MR. BATES:**  Good afternoon, Your Honor.  My name is Ivan Bates, and this is my co-counsel.

**MR. FLETCHER:**  Good afternoon, Your Honor.  Loyst Fletcher.

**THE COURT:**  Good afternoon.

**MR. BATES:**  We represent Mr. Carl Force.

**THE COURT:**  Good afternoon, sir.

This is the time set for sentencing.  Have counsel had the opportunity to review the presentence report?

**MS. HAUN:**  Yes, Your Honor.  The government has.

1    (Reporter interruption)

2            **THE COURT:**  All right.  Go ahead.

3            **PROBATION OFFICER:**  Kyle Pollak for U.S. Probation,

4    Your Honor.

5            **THE COURT:**  Okay.  So the question I had for the

6    defense counsel:  You did have an opportunity to review the

7    presentence report?

8            **MR. BATES:**  Yes, sir, I have reviewed it.  I mailed

9    it to my client, just so the record's clear.  My client and I

10   conversed about it.

11      And I have even reviewed it, the absolute last copy, with

12   my client as well, physically.

13           **THE COURT:**  Very good.  Thank you.  It didn't appear

14   that there were any objections to the presentence report that

15   require resolution.

16      There was some reference to the loss amount and some

17   reference to some dispute about that, but appeared to me that

18   it wasn't going to affect, one way or the other, the

19   calculation.

20           **MS. HAUN:**  That's correct, Your Honor.  The Probation

21   Officer resolved that.

22      The government had an objection, the defense had an

23   objection, and the Probation Officer himself resolved that.

24   So the parties now are in agreement about the adjusted offense

25   level.  And the Probation Officer's (Indicating) also in

1  agreement with that.  That was the same offense level

2  reflected in the parties' plea agreement.

3          **THE COURT:**  Okay.  Yes?

4          **MR. BATES:**  We just have a small issue, but it's not

5  really -- it's an issue, but not really an issue.  There is an

6  amount of $337,000 in terms of a restitution amount.

7      And with that, we do know that there was $37,000 in cash

8  that was seized by the Federal Government.  And that $37,000

9  in cash is actually, as I understand it, the Federal

10  Government has that cash.

11      And so in terms of the terms of the restitution amount, we

12  believe that 37,000 of the 337,000 is actually physically

13  being held by the government.

14          **THE COURT:**  Okay.

15          **MR. BATES:**  And that was --

16          **THE COURT:**  I'm not sure -- that doesn't affect the

17  loss calculation.

18          **MR. BATES:**  No, not at all, Your Honor.

19          **THE COURT:**  So is there some dispute when we get to

20  restitution about the appropriate amount to award for

21  restitution?

22          **MS. HAUN:**  I don't believe so, Your Honor.  I think

23  restitution and forfeiture are two different matters for the

24  Court to decide.

25      But in terms of the loss amount and the appropriate

1   guidelines range, the parties are in agreement that that is

2   what it is.

3       **THE COURT:**  Okay, we'll move on and deal with that

4   later if we have to.

5       Let me make it clear what I have reviewed.  I've reviewed

6   the presentence report; I reviewed the plea agreement; I

7   reviewed the sentencing memoranda that was submitted by each

8   side, including the Defendant's submission, the motion for a

9   downward departure on the grounds of diminished capacity and

10  outrageous government conduct.

11      I have reviewed the psychiatric reports of the

12  government's expert, Dr. Martell; and the expert report of

13  Dr. Kleinman that is offered by the defense, which appears to

14  expand on an earlier report she did in 2008 regarding the

15  Defendant's fitness for duty.

16      I have also reviewed the letters in support of Mr. Force

17  that were submitted by his mother, his aunt, his sister,

18  pastor of his church, his wife, that came in just recently.

19  And also the statement that Mr. Force himself wrote.

20      This sentencing flows from the entry of a plea agreement,

21  of a plea pursuant to Rule 11(c)1(B), and an agreement under

22  that rule.  It's a plea to the three-count information that

23  charges money laundering, obstruction of justice, and

24  extortion under the color of an official right.

25      Our starting point, as always, must be the advisory

sentencing guidelines, which I find are correctly calculated
in the presentence report and the plea agreement as a total
offense level of 27, a criminal history category of I, which
would yield an advisory sentencing guideline range of 70 to 87
months.

The government argues for a high-end sentence of 87
months.  The PSR recommends a low-end sentence of 70 months.
The defense argues for a departure of seven levels owing to
diminished capacity, plus a four-level departure premised on
the government's conduct in returning Mr. Force to an
undercover position after some incidence of psychiatric
breakdown.  And that would result in an offense level of 16
and an advisory guideline range of 21 to 27 months.

So let me -- before I ask for the parties to address the
situation, let me give you the benefit of my preliminary view
on the motion for a downward departure.  I believe that motion
should be denied.  And that neither of the two bases advanced
by the Defendant warrant a departure.

The record which includes the psychiatric reports of
Doctors Kleinman and Martell do not support, in my mind, a
finding that Mr. Force committed the offense while suffering
from significantly reduced mental capacity, nor were any such
reduced capacity present, would I think in this instance it
substantially contributed to the commission of this
sophisticated, complex, and extended over time offense.

1  Additionally, while the wisdom of the government placing

2  Mr. Force in a central role in this intricate, involved

3  undercover operation may be subject to some question, it does

4  not arise to the level of outrageous government conduct, in my

5  mind.  Mr. Force was the master of his fate in this whole

6  disgraceful episode.

7  So let me first turn to Ms. Haun.

8  **MS. HAUN:**  Thank Your Honor.

9  I think we have stated the government's position in the

10  pleadings, and in particular the sentencing memorandum that

11  the government filed the Friday before last.  So I don't want

12  to really rehash that here, because I know that you've already

13  read that.

14  I would just add to that the significance of the crimes

15  here.  And they really did extend over time.  We're not

16  talking about a single lapse of judgment, but something that

17  extended over months, and indeed, years.

18  And Your Honor, this is one of those cases where general

19  deterrence is just as important, and in fact, possibly more

20  important than just specific deterrence as to Mr. Force.

21  When those charged with investigating and prosecuting

22  crimes themselves turn to crimes, and in fact serious crimes

23  like these, the Court must send a powerful message in the form

24  of a lengthy prison sentence that that conduct is going to be

25  punished.  And the system is looking at how -- everyone's

1    looking at how the system treats its own here in this context.

2        One thing to consider is that it had -- had it not been

3    for New York's investigation, the separate investigation into

4    Mr. Ulbricht, and the fact that New York and that trial team

5    did not have to rely on Baltimore's investigation into

6    Ulbricht -- an individual, by the way, the New York judge

7    ended up imposing a life sentence on -- but for that

8    investigation, that separate New York investigation, the

9    government's ability to bring Ulbricht to justice and to

10   prosecute Ulbricht in Maryland has been seriously impaired --

11   or would have been seriously impaired by the conduct of

12   Mr. Force as, as he points out, he was one of the lead

13   investigative agents on that case.  In his own sentencing

14   memo, his attorney says so.

15       So it doesn't seem right to give Mr. Force any kind of

16   downward variance in light of that, Your Honor.  And I think

17   that the Court's already indicated it's not prepared to give a

18   downward variance for those reasons.

19       Because of all the other reasons that I've detailed in the

20   government's sentencing memo and that we've detailed, we do

21   seek a high-end sentence here of 87 months.  We think that

22   sentence is sufficient but not greater than necessary to deter

23   both general conduct of this sort in the government, but also

24   to deter Mr. Force in the future.

25           **THE COURT:**  Just going back for a moment, I did give

1   my tentative view, but it's a tentative view.  The downward

2   departure based on diminished mental capacity -- it is

3   evident, isn't it, that the -- there were problems,

4   significant ones, while he was an agent prior to the

5   undercover work in the Baltimore investigation?

6        **MS. HAUN:**  Yes, that's correct, Your Honor.  Dating

7   back to 2008.  However, in 2010, Mr. Force's own doctors did

8   find him fit to return to duty, fully fit to return to duty.

9   And we're looking at conduct here in 2012, 2013, 2014, so this

10  is some number of years after the episode in 2008.

11       But it is true no one in the government is going to

12  dispute that.  Mr. Force, he was going through some issues at

13  that time.

14       **THE COURT:**  Well, and so --

15       **MS. HAUN:**  And the government doesn't doubt that

16  that's still the case, Your Honor, but in order to meet the

17  sentencing guidelines test, it's a two-pronged approach.  And

18  we don't think that, as Your Honor said, it was significantly

19  reduced.  We don't think that the evidence here supports that

20  it was significant reduction in mental capacity.

21       **THE COURT:**  Well, that then leads to the second basis

22  for the departure, which was the government knowing of

23  not-inconsequential problems that he had.

24       Should I take into -- let's assume for a moment that some

25  reasonable minds can say you shouldn't put somebody on this

kind of sensitive investigation who has these kind of mental issues in the past. Why -- why shouldn't that go into the calculus as to whether or not there should be a departure, in light of what the government decided to do in putting him in that position?

**MS. HAUN:** Well, Your Honor, again I would come back to the fact that this was in 2008. And in 2010, again, Mr. Force was found fully fit for duty.

Also, the choice that the government had at that time was to put him out on the streets with his gun and badge, or to put him in an undercover capacity online. Obviously, he was able to do a lot of damage to the government's investigation when he was in that undercover online capacity. But I think that was the government's choice at that juncture.

Now, that -- again, back in 2008. Fast forward to 2010, and he's declared fully fit for return to duty. So I certainly don't think there is any basis for outrageous government conduct.

**THE COURT:** I assume you agree that outrageous government conduct is not simply the government made an unwise decision in terms of placing someone in a position when, with the benefit of hindsight, you wouldn't put that person in that position.

**MS. HAUN:** I would agree with that, Your Honor.

**THE COURT:** All right. I'll turn to the defense

1    side.

2         **MR. BATES:**  Yes, Your Honor.  Thank you, Your Honor.

3    When I had the opportunity to speak with Mr. Force, one of the

4    first things we began to talk about -- we had a real honest

5    open dialogue -- was his need to accept responsibility for his

6    actions.  And Mr. Force has done that.  You can see it through

7    the facts.

8         And when we sit down, there's no need to recount the

9    facts.  We've heard the facts, we've read the facts, we know

10   the facts of the case.  We see it from the individuals that

11   he's victimized.  We also understand the trust that the United

12   States government must have with all the citizens.  And we

13   understand the need to trust the system.

14        And with that, it has gotten to us to the point of 70

15   months to 87 months.  Somewhere within there, that's what our

16   system says that we should sentence Mr. Force.

17        However, on the defense side, we're saying that's not the

18   end of the story.  There's so much more to this story than

19   those numbers right there, Your Honor.

20        And for us, we do say that the government played a role in

21   this.  Now, was the government the main impetus?  No.  We

22   recognize Mr. Force was.  We do understand that.  But, the

23   government knew Mr. Force's history.

24        When you become a government agent, they're going to sit

25   down, they're do a number of tests, background tests.  They're

going to look at your family.  They knew that Mr. Force came

from a broken home, in a sense that his father was an

alcoholic who did abuse his mother.  They knew that his mother

and father both suffered from alcoholism, and that Mr. Force

was the oldest of the three children.

**THE COURT:**  Of course, if the government ever used

any of those facts as a justification for not giving somebody

a position of trust they would be subject, and rightfully so,

to some kind of lawsuit.

**MR. BATES:**  I agree, your Honor.  However, they're

just sometime the building blocks that help us have a deeper

understanding of the individual and some of the issues that he

or she may at some time experience, Your Honor.

Because --

**THE COURT:**  To be clear, I'm not disputing that I

could take into account and should take into account

Mr. Force's background, his entire history.  But what I hear

you asking me to do is not just that, but actually give you a

departure based on the notion that it was the government's

fault in placing him in a position of trust and confidence

when he had had -- when they knew he had had some mental

difficulties, and perhaps knew he had some difficulties,

although I don't think they're out of the norm, in terms of

his upbringing.

So, those are two different arguments.

1      **MR. BATES:**  They are, somewhat, Your Honor.  But

2  basically, this is how I look at it.  Mr. Force, as all of us,

3  we're puzzles in life and little experiences fill us in, who

4  we actually are.  And that was just the beginning piece of

5  Mr. Force and his background.  That was the foundational

6  issues that Mr. Force had.

7      When he became 21 his parents divorced and some of the

8  stress that he had to go through in terms of dealing with his

9  parents' marriage and their relationship, that was alleviated.

10      That allowed Mr. Force the opportunity to go to college.

11  He became married.  He joined and eventually became a DEA

12  agent.

13      One of the first signs that we have to show that Mr. Force

14  has something going on in his background is while he's

15  undercover back, I believe, in '99 or 2000, he himself has an

16  alcohol issue, Your Honor, while he is under cover.  And I

17  think at that moment in time it is important to understand,

18  okay, Mr. Force comes from a system and a family of

19  alcoholics.  Mr. Force is dealing with the stress of being

20  undercover with alcohol.  And Mr. Force, what's going on with

21  you?

22      Now, by all means, that doesn't mean we stop him from

23  being a DEA agent.  That doesn't mean that he can never be

24  undercover.  What that does say is okay, maybe we bring him

25  in, we sit down, we give him counseling, maybe we sit down,

deeper alcohol counseling so we can maybe find out what's going on with Mr. Force.

But that's not what happened with Mr. Force. Mr. Force actually was promoted, and he took an assignment to Puerto Rico. It was a hardship assignment. Which means for three years, he had to be away from his family and he had to be away from his wife and kids. He was in Puerto Rico oftentimes being undercover once again.

Everything seemed to be okay in terms of managing stress, because we don't see him turning to alcohol. And it wasn't until after he had done a three-year time period that he wanted to come home and be with his family. The government said no, they still needed him to finish up or doing whatever they were doing.

Something happened with Mr. Force, and he broke. He snapped. At that time period, he was institutionalized, even though it was for a week, but something really happened. It took two years, from 2008 to 2010, before the government actually said: Okay, we can allow you to go back to duty right now. And they finally did.

And I understand from the government's standpoint, "Oh, our doctors said he was okay." But I think, Your Honor, when you place an individual under cover and they have shown you twice that the stress is so deep that they cannot handle it, that's the third time something terrible could happen. And

1    that's where we are here.  This is the third time.

2       He's assigned to the office in Baltimore City.  One of the

3    issues that Mr. Force has when he is in the office in

4    Baltimore City is at first he's a great officer.  He's doing

5    what he needs to do.  Because why?  It's pretty much,

6    quote-unquote, they call street reps.  I.e. there's a drug

7    dealer, we see who he is, we develop information, there's a

8    wiretap.  Boom, we go and get him, we arrest him.  And it's

9    kind of easy at that moment in time.  It's not until something

10    is deeper and he's pulled back into that undercover world.

11       Let's talk about an undercover agent.  An undercover agent

12    by definition has to be an individual who lies and is very

13    good at lying and manipulating.  So you have to be able, if

14    you are a sane individual who has no mental-health issues, be

15    able to separate the two.  Be able to say:  Oh, you know what,

16    I'm playing a role, and I'm playing it so well that you become

17    that individual.  Because some of the greatest undercover

18    agents we have never heard about, but we see sometimes in

19    movies and television shows and things like that later on in

20    life.  And they just give you a window into that world.

21       But to be a very good undercover agent, which Mr. Force

22    was, he had to take that persona.  He was very good at that

23    persona.  But we do know he has mental-health issues.

24       Dr. Carol Kleinman talked about him being diagnosed and

25    what the diagnosis meant.  And one of the things that she also

talked about was when you have a 20 percent chance of
basically feeling that people are out to get you, that you
become almost polarizing in terms of some of the other people
you are hanging around with.

I forget her exact wording, Your Honor.  If you want -- I
actually have it highlighted -- I can read the exact wording
in the report.  But this was one of things she talks about in
terms of feeling as if you are being persecuted.

The sign was there.  Because Dr. Martell spoke to
Mr. Force, and Dr. Martell says that Mr. Force told him one of
his issues was with his supervisors because he felt they were
out to get him because they wanted him to document all the
conversations.

Now, the government will interpret that:  Oh, he was
trying to hide what he was doing.  I interpret that
differently.  I interpret that as:  Why would you be worried
about what your regular job is, if you're now maybe starting
to have that break from reality because you're possibly
feeling persecuted.  We could look at it either way --

**THE COURT:**  Nobody made him continue as an agent.  He
could have quit.

**MR. BATES:**  He could have quit, Your Honor, but at
that moment in time when you have mental-health issues, you're
not going to necessarily know --

**THE COURT:**  Perhaps not.  But then, then it's a

1  little hard to say that the government is acting outrageously

2  in having him remain in that position.  He -- even with some

3  mental-health challenges, he was not sentenced to this.  And

4  he could have left.

5          **MR. BATES:**  You're right, Your Honor.  But when I

6  talk about the outrageous conduct on behalf of the government,

7  it's just not that he was being placed as an undercover agent.

8  There's a number of other issues as well in terms of that

9  particular unit, Your Honor.

10     The biggest issue I have in terms of Mr. Force, he was

11  sick.  They knew he was sick.  They knew he had mental-health

12  issues.  They knew he oftentimes could possibly suffer an

13  additional break from reality.  The government also had a role

14  within that situation, Your Honor.  They did.

15     And I do understand that:  Yes, this is Mr. Force's --

16         **THE COURT:**  The government's obligation to save him

17  from himself is essentially your argument.

18         **MR. BATES:**  Well, the government --

19         **THE COURT:**  And when the government didn't do so.

20  that's tantamount to outrageous government conduct.

21     **MR. BATES:**  It's not just that, Your Honor.  It's the

22  poor supervision.  Why do I say that?  One of the reasons is

23  Baltimore City's DA division, they were not prepared on how to

24  deal with the bitcoins.

25     We did attach with our exhibit the e-mail where Mr. Force

says:  Okay, basically, how do I store -- what do I do with

these bitcoins?"

     My understanding and interpretation of the e-mails they're

saying:  Oh, just pretty much put them in your own personal

wallet.

     At that moment in time, from my understanding and speaking

and spending time with Mr. Force, he is a rules individual.

Most individuals that are very good with numbers, they

understand the rules.  He's an accountant, a CPA.  He

understands the rules.  At that moment in time, he doesn't

have any rules.  Also, at that moment in time, he loses his

father who's sick with cancer.

     When you put all of that together, Your Honor, I honestly

feel that that is the break that you see right here.  That at

that moment in time, from the stress of the job, from losing

your father to basically not having your support system within

your job --

     **THE COURT:**  These things happen to people every day,

and they -- they don't embark on a sophisticated scheme, very

cleverly constructed.  That's not the reaction from simple

life stresses.  People lose their parents.  People have

difficulties.

     And to then -- this would be a very different case, these

arguments would have much more salience, I think, if there was

a -- one episode where a terrible mistake was made.  That's

1 not this case.  This case is an extended, thoughtful, one

2 would say devious and clever scheme.

3    And you can't throw that on "I lost my father" or "I had a

4 lot of stress."  I mean, it just -- quite frankly, it doesn't

5 link together.

6        **MR. BATES:**  I understand where the Court's coming

7 from.  But the difference here is the mental illness,

8 Your Honor.  Mental illness is something that we as a society

9 are still struggling to totally understand.  Even the doctor

10 in her own report, it's (As read):

11            "About 20 percent of patients who are severely

12            depressed may experience psychotic symptoms such as

13            persecutory delusions that others are against him or

14            her to destroy them."

15    Ambiguity can often trigger panic attacks with underlying

16 anxiety about being persecuted or singled out for special

17 treatment, Your Honor.

18        **THE COURT:**  Okay.  Tell me why that diagnosis then

19 relates to a decision to construct and implement a scheme to

20 defraud of this sophisticated nature?  How is paranoia and all

21 the other things that you mentioned, where's the nexus to this

22 crime?

23        **MR. BATES:**  Well, the way I -- the nexus to crime is

24 this way, Your Honor.  He's doing the job.  He's already

25 established the fake identity.  Per what he's supposed to do

on his job.  He's already doing it.  And then, what he sees is

he needs something, what -- they're out to get him.  He needs

to leave the department.  He needed to leave the department,

they're out to get him, boom, he becomes French Maid and when

he becomes French Maid, it's not as if he has to put together

a whole new scheme.  He's already playing that role as Nob.

So's it's easy for him to just go ahead, and he understands

the toll robbers (Phonetic) and all of that.

Now, I agree if it's an individual who didn't understand

the internet such as myself, and then I started doing that,

then that's something different.  But he's already acting out

as being Nob.  It's not very difficult for him now to become

French Maid.  It's easy to become French Maid, because that's

an additional stressor where they're not on your back as much.

And if you look at it like this, you're feeling you are being

persecuted by your fellow command.  You know what, if I'm

French Maid I can still get them, but I don't have to answer

to my lieutenant, I don't have to answer to my sergeant, I

don't have to answer to anybody else.

And then when your father dies, you are not making the

proper judgment calls because that's one of the issues that

you do have with the mental-health issues, that your mind

doesn't work the same in terms of making competent and fair

decisions.

And that's what I believe what happened here in terms of,

1  one, becoming French Maid was the first step.  And then that

2  was the easy step.  Then:  Okay, I can store the bitcoins in

3  just my own personal wallet.  So you almost feel as if you are

4  doing your own investigation and you are not worried about

5  your supervisors telling you what to do.

6      And then the other step that I do recognize, and it was

7  probably the one that has the Court the most concerned, is

8  when he becomes the head of security for CoinMKT, and then he

9  takes the money from that other individual.  It's almost as if

10 the more freedom he received from his supervisors, the more he

11 began to go and make terrible decisions.

12     Now, it's not necessarily all of their fault, but what it

13 also says is when you have an officer who has the

14 mental-health issues, when you have an officer who has twice

15 previously been undercover and those two situations didn't

16 work well, you have to make sure that there's a system of

17 checks and balances.

18     Your Honor, realistically --

19     **THE COURT:**  I mean, the people who then get

20 victimized in the process, they may have a nice claim against

21 the government that:  How could you put this man out there

22 doing the work that he's doing?

23     But why should it redound to his benefit?  Why should he

24 get a break for this?

25     **MR. BATES:**  Your Honor --

1        **THE COURT:**  I just don't see it.

2        **MR. BATES:**  I think, when you're saying it's a break,

3   he still -- one, he's going to jail.  There is no doubt he's

4   going to jail.

5        **THE COURT:**  Correct.

6        **MR. BATES:**  He has lost his career.  There is no

7   doubt he's lost his career.  He's lost his marriage.  There's

8   no doubt he's lost his marriage.  He's lost everything he has.

9        But, I honestly believe he still will always have a life

10  sentence because of the mental-health issues that he has.  He

11  will always have that life sentence.  And putting him in a

12  stressful environment, not giving him the supervision that he

13  needed to have, that you would expect the government at that

14  level to give their employees, Your Honor, he has been

15  somewhat victimized by his own mind, in terms of his

16  mental-health issues.

17       Now, in terms of what is realistically fair, I sat down, I

18  looked at it again.  I recognize, you know, Your Honor, in

19  terms of the four-level downward departure, once you sit down

20  and really look at the case and things like that, I agree with

21  Your Honor.  I'm not -- I can't sit up here and make a

22  good-faith argument to sit down and say:  Oh, the government

23  was so terrible, and that we should get an additional four

24  levels.

25       I think there was some mistakes made.  Do I think they

1  probably would argue more civil mistakes instead of a criminal

2  mistake?  Yes.  But in terms of a seven-level downward

3  departure, you can get up to seven levels.  I personally feel

4  that I think the four-level downward departure is fair.  And

5  you're looking at around 48 months.

6      That's what, in terms of my -- spoken, myself and

7  Mr. Force, in terms -- it does take into consideration some of

8  his issues.  But it doesn't reward him, as the Court just

9  mentioned, in terms of:  Okay, you know, you do have these

10  mental-health issues; you went out and victimized other

11  people; you went out and you tarnished the name of some of the

12  government.  But you know what?  We're going to reward you.

13      What it's saying is:  You know what, you're still going to

14  jail, you're going to go to prison, you've lost your career,

15  you've lost your name, and there are so many other issues.

16  But you still have to live with this mental health diagnosis

17  for the rest of your life.  And we're going help you deal with

18  that, but we're going to help you deal with that not in just

19  throwing you away, but we're going to help you deal with it in

20  an environment, say, for four years.

21      Or the other request that I have, and I think the

22  government and I are both in agreement, we would ask that the

23  defense be allowed to go to Butner, North Carolina, the

24  hospital.  I think that would be perfect for him.  His family

25  is nearby, and he will be able to get the help that he needs.

1    I do recognize, Your Honor, you have to keep both -- treat

2 the Defendants very similarly, whether it is Mr. Bridges or

3 whether it's my client, Mr. Force.  But to me, there is a

4 difference here.

5    And the difference is, one, Mr. Force does have the

6 mental-health issues.  I don't know about all of Mr. Bridges's

7 issues.

8         **THE COURT:**  Mr. Bridges hasn't been sentenced yet, so

9 I have not read any of the materials.  So I don't know.

10         **MR. BATES:**  Exactly.  But what I would say,

11 Your Honor, is there was -- the writing was on the wall.  And

12 just as my client here will have to suffer, I do think the

13 government has some burden to bear with this as well.

14    The message was there, it was clear:  Don't put this man

15 in the situation under cover.  He cannot handle it.

16    And because of that Your Honor, we would ask for a

17 sentence, as I previously asked, of four years.

18    Thank you.

19         **THE COURT:**  Before I turn to Mr. Force, Ms. Haun,

20 anything further?

21         **MS. HAUN:**  Your Honor, the notion that Mr. Force

22 should get a reduction because he was operating in a stressful

23 environment and had mental-health issues, I think that would

24 send an incredibly dangerous message, if this Court were to

25 give Mr. Force a lower sentence.  It would send a message to

1  other government employees.

2  　　Many, many of us operate in stressful environments.  Many

3  federal agents operate in stressful environments.  It's a

4  stressful job.  And I think it would send a horrible message

5  that that kind of stress would be in any part condoning what

6  Mr. Force did in this conduct -- in this case.  I think that

7  would not send a deterrent message; it would send the

8  opposite.  And I think that that would be very ill-advised.

9  　　I also just want to focus on -- we heard a lot about his

10  undercover role.  But I want to focus back, and the Court

11  should really focus on what Mr. Force was doing not in his

12  undercover role.  With Mr. Ulbricht he's operating in his

13  undercover role as Death from Above, as French Maid, as Nob.

14  　　But let's look at what he did to the individual we've

15  identified as R.P., a victim here.  Mr. Force seized his

16  entire life savings, really, based on nothing.  That

17  individual tried to contact CoinMKT and said:  My money is

18  frozen, I can't get it.

19  　　And they said:  The government seized it.  Go talk to

20  Mr. Carl Force.

21  　　That had nothing to do with Mr. Force's undercover

22  capacity.  And nor did things like what Mr. Force did

23  vis-à-vis Venmo, or vis-à-vis covering up his conduct.

24  　　Mr. Bates talked a lot about poor supervision.  But of

25  course, a lot of what Mr. Force was doing was completely

1   unknown to his supervisors, because Mr. Force was doing things

2   like forging their name on subpoenas, and using their

3   signature stamps without their authorization.

4        And the whole notion about he didn't know what to do with

5   the bitcoin so he just put it in his personal account,

6   Your Honor, that is absolutely ludicrous.  Any agent knows

7   that the right answer is not to, in the absence of direction,

8   put it in your own bank account.

9        And even if there wasn't guidance on April 18, on the date

10  that that e-mail was sent, the thing that happened on April 18

11  is that Mr. Force's own account at Bitstamp had been seized

12  that day.  And the government's view all along has been that

13  it was because of that seizure or freezing of Mr. Force's

14  Bitstamp account that Mr. Force thought he needs to go send an

15  e-mail to cover his tracks and say:  Oh, by the way, what do I

16  do with this bitcoin?

17       So I think none of those arguments are persuasive.  And

18  for all of the reasons that the government set forth in its

19  sentencing paper, we are seeking a high-end sentence here of

20  87 months.

21       **THE COURT:**  Mr. Bates, before I turn to Mr. Force,

22  anything further from you?

23       **MR. BATES:**  Very briefly, Your Honor.  In reference

24  to the individual victim from CoinMKT, Mr. Force did sit down

25  and talk to his supervisors, and they in fact authorized the

1  seizure.

2      Now, they did not authorize Mr. Force to put the bitcoins

3  in his personal account.  But they did know the investigation.

4      And talking about the $37,000 in cash, that is actually

5  government -- in the hands of the United States government.

6      That's the only thing I wanted to talk about.  Now

7  Mr. Force would like to say something, Your Honor.

8        **THE COURT:**  Yes.  Mr. Force, this is your sentencing.

9  You have a right to speak directly to me.  I did review your

10  statement, I want you to know that.

11      But it's up to you.  If there's something you would like

12  to say, this is the time to say it.

13        **THE DEFENDANT:**  I would just like to publicly

14  apologize to the American people, to the U.S. government, to

15  the Court.  To my friends and family.  To God.  I'm sorry.  I

16  -- I lost it.  I don't know -- I don't understand a lot of it.

17  And, I apologize.

18      And I would like to add, also ask that you please send me

19  to Butler (sic).  I haven't been receiving any of my

20  medication since April, and the last five months or whatever

21  since I have been arrested have been very, very difficult.

22      Thank you.

23        **MR. BATES:**  Excuse me, Your Honor.

24        **THE COURT:**  Yes.

25        **MR. BATES:**  He also asked me to request that it

hopefully would be expedited.

**THE COURT:** The designation?

**MR. BATES:** Him being able to get to Butler (sic), to leave here as quickly as possible.

**THE COURT:** I'll tell you that I'm perfectly prepared to recommend the Butler -- Butner facility, although Butner is usually a place where there is -- where defendants go for purposes of analysis. And I think when the sentence is -- well, let me stop there. I'm not sure what the criteria is for assignment to the particular facility.

What I do is make a recommendation. And the Bureau of Prisons may or may not follow it. I don't have the authority to order a particular facility.

So with that said, I am perfectly prepared to recommend it if it's otherwise consistent with what they -- and I assume your request is if, for whatever reason, the Butner facility is not one that is going to work, at least geographically, Mr. Force wants North Carolina, if it's possible.

**MR. BATES:** Yes, if possible. Maryland, North Carolina, the East Coast.

**THE DEFENDANT:** (Inaudible)

**THE COURT:** I'll start with -- put North Carolina as the preferred -- anything within striking distance of North Carolina, and then Maryland as an alternative. And I'll put that in the order.

1    **MR. BATES:**  Yes.  Thank you.

2    **THE COURT:**  All right.  Is the matter submitted?

3    **MS. HAUN:**  Yes, Your Honor.

4    **MR. BATES:**  Yes, sir.  Thank you.

5    **THE COURT:**  Applying the factors that are set forth

6    under Title 18 United States Code Section 3553(a), which

7    directs me to impose a sentence sufficient but not greater

8    than necessary, I do begin with the nature of the crime.

9        The extent and the scope of Mr. Force's betrayal of public

10   trust to me is quite simply breathtaking.  It's compounded by

11   the fact that it appears to have been motivated by greed,

12   thrill-seeking, and as the effort for a book and movie deal

13   reflects, perhaps fame as well.

14       Among other things, as the papers all reflect and counsel

15   have discussed, it involved creating a fictitious persona,

16   selling law enforcement information to the target of the

17   investigation, extorting and swindling that target and others

18   in the process, falsifying documents, issuing fake government

19   subpoenas, lying to law enforcement officials, abusing his

20   office over an extended period of time in a scheme that can

21   only be described as byzantine.

22       Now I'm cognizant of the -- some difficult family issues

23   that he confronted in his upbringing.  Frankly, not -- not

24   atypical of, I think, what many in the population have to deal

25   with, but it's -- I'll take it into account.  As well as the

1  mental-health problems that he faced that were significant,

2  resulted in a major episode that involved hospitalization.

3  And I also take into account the close relationship to many of

4  Mr. Force's family members that he has, his children and other

5  members of his family.

6      That said, none of those factors begin to explain or

7  mitigate the conduct in my mind that is present here.  In the

8  interest of deterrence and to promote respect for law and to

9  underscore that those who are entrusted with public

10 responsibility and law enforcement authority are not above the

11 law, a significant sentence of imprisonment is in my mind

12 mandated here.  Accordingly, I find that a mid-range sentence

13 of 78 months is the appropriate sentence.

14     Any legal reason why sentence may not be imposed at this

15 time?

16           **MS. HAUN:**  No, Your Honor.

17           **MR. BATES:**  No, Your Honor.

18           **THE COURT:**  Pursuant to the Sentencing Reform Act of

19 1984, it is the judgment of the Court that Carl Mark Force,

20 IV, is hereby committed to the custody of the Bureau of

21 Prisons to be imprisoned for a term of 78 months.  This term

22 consists of 78 months on each of Counts One, Two and Three,

23 all counts to be served concurrently.

24     Upon release from imprisonment, the Defendant shall be

25 placed on supervised release for a term of three years.  This

term consists of terms of three years each on Counts One, Two and Three, all such terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons the Defendant shall report in person to the Probation Office in the district to which the Defendant is released.

While on supervised release, the Defendant shall not commit another federal, state or local crime; shall comply with the standard conditions that have been adopted by this Court; shall refrain from any unlawful use of controlled substances; and submit to a drug test within 15 days of release on supervised release, and two periodic drug tests thereafter; and shall comply with the following conditions:

One, the Defendant shall participate in a mental-health treatment program as directed by the Probation Officer.  The Defendant is to pay part or all of the cost of this treatment, and in an amount not to exceed the cost of treatment as deemed appropriate by the Probation Officer.  Payment shall never exceed the total cost of mental health counseling.  The actual co-payment schedule shall be determined by the Probation Officer.

Two, the Defendant shall pay any restitution and special assessment that is imposed by this judgment, and that remains unpaid at the commencement of the term of supervised release.

Three, the Defendant shall not open any new lines of

credit and/or incur new debt without the prior permission of the Probation Officer.

Four, the Defendant shall provide the Probation Officer with access to any financial information, including tax returns, and shall authorize the Probation Officer to conduct credit checks and obtain copies of income tax returns.

Five, the Defendant shall have no contact with victims unless otherwise directed by the Probation Officer.

Six, the Defendant shall submit his person, residence, office, vehicle or any property under his control to a search. Such a search shall be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of condition of release. Failure to submit to such a search may be grounds for revocation. The Defendant shall warn any residents the premises may be subject to searches.

Seven, the Defendant shall have no contact with any Co-defendant in this case, namely Shawn Bridges.

Eight, the Defendant shall cooperate in the collection of DNA as directed by the Probation Officer.

Nine, the Defendant shall not own or possess any firearms, ammunition, destructive devices or other dangerous weapons.

It is further ordered that the Defendant shall pay to the United States a special assessment of $300, $100 per count, which shall be due immediately.

1     When incarcerated, payment of criminal monetary penalties

2  are due during imprisonment at the rate of not less than $25

3  per quarter, and payment shall be through the Bureau of

4  Prisons Inmate Financial Responsibility Program.  Criminal

5  monetary payments shall be made to the Clerk of the U.S.

6  District Court, 450 Golden Gate Avenue, Box 36060, San

7  Francisco, California, 94102.

8     It is further ordered that the Defendant shall pay

9  restitution totaling $340,000, which shall be due immediately

10  to the following victims in the following account.

11     And this is where we had some discussion about forfeiture

12  amount, restitution amounts, loss amount.  Is the restitution

13  that is reflected in the proposed sentence that is in the PSR

14  that has 337,000 in restitution to R.P. and 3,000 to C.G., is

15  there any dispute about that?

16          **MR. BATES:**  There is a dispute, Your Honor.

17          **THE COURT:**  Okay.

18          **MR. BATES:**  37,000 of the 337,000, it's in the

19  government's custody.  It is cash.

20          **THE COURT:**  Uh-huh.

21          **MR. BATES:**  And we have seen the paperwork.  My

22  problem is the last young man, for 3,000, I've never seen any

23  paperwork.  The only thing you have is him saying that

24  Mr. Force took $3,000 from his person.  We would have at least

25  liked to have seen something to show that he legally obtained

1  $3,000.

2      **THE COURT:**  So on those two issues with respect to

3  the 37,000, if that -- is that going to be -- the government's

4  going to request forfeiture of that amount?

5      **MS. HAUN:**  Your Honor, there are two separate

6  matters.  There's restitution to the victims, and then there's

7  forfeiture.  And the forfeiture is as set forth in the plea

8  agreement.

9    This is the first I have heard that there was any dispute

10  as to restitution amount.  I don't think there was any

11  objection --

12      **THE COURT:**  My only question is if -- can part of

13  that restitution be in the form of the 37,000, that the

14  government has forfeited?  In other words, you don't want to

15  double-count the 37.

16      **MS. HAUN:**  Correct, Your Honor.  And our asset

17  forfeiture unit talked with -- about this issue with them, and

18  they are aware.  And they oftentimes will take part of

19  forfeiture and offset any kind of restitution that's been

20  paid.

21    But in this case they haven't yet made a determination.

22  And I have been instructed by that unit to ask you to impose

23  restitution as it's reflected in the PSR.

24      **THE COURT:**  Well, so, it's a possibility then, if I

25  do it that way, though, that they will elect not to credit the

restitutionary amount with the 37,000 and then -- I mean at
that point -- effectively, if Mr. Force is paying the 37,000
as restitution and he's -- he's paid it twice.

I mean, I don't see why in some ways the government would
object to the restitution amount being either 300,000 and then
they use the 37, or alternatively, he have a 337,000 amount
and the government represents to me that they're going to
credit with the 37,000 forfeiture.

I mean, you can do either one.  But the third option
leaves open the possibility of double-counting.

**MS. HAUN:**  You're correct, Your Honor.  It does leave
open the possibility of double-counting.  And this is
something we've discussed with our asset forfeiture unit, and
apparently this is routinely done.  It does leave open that
possibility.  And I suppose it is possible that the asset
forfeiture unit, financial litigation unit would say:  No.
Those are two separate things.

I'm confident that --

**THE COURT:**  I'll phrase it this way.  I'll let you
have one of the two.  I don't frankly -- I shouldn't say I
don't care what they say, but their modus operandi here, it
can be what it is.  But I'm not going to defer to that,
because it makes me uncomfortable.

So I will either reduce the restitution amount to 330,000
-- or 300,000 for R.P., or I'll do 337,000, but then I'm

1  taking it off the forfeiture list.

2      So which would you like?

3          **MS. HAUN:**  Well, I would ask that restitution be

4  imposed to R.P.

5          **THE COURT:**  Okay.  So then when we get to forfeiture,

6  I am x-ing out 37,000 as a forfeited amount.

7          **MS. HAUN:**  If that's what the Court wants to do.

8          **THE COURT:**  So restitution in the amount of 337,000

9  to R.P.

10      Now, with respect to C.G. and the 3,000 that Mr. Bates is

11  saying he doesn't know what the basis for that is other than

12  C.G. saying "He owes me 3,000," what's the government's

13  response to that?

14          **MS. HAUN:**  Your Honor, the government's response is

15  this should have been raised as an objection to the PSR.  This

16  is something that we provided.  We provided all the discovery

17  both to Mr. Bates as well as to the Probation Officer

18  (Indicating).

19      Probation Officer and the government were of the view that

20  this was not in dispute.  This is not something I remember

21  being in dispute.  So --

22          **THE COURT:**  Okay, so what is -- I'll accept that, and

23  I'm not saying I'm not going to go with that lack of

24  objection.  But what is the basis for the 3,000?

25          **MS. HAUN:**  This stems from -- and this is one of the

```
1   cooperators that was in the case.  This stems from money that

2   Mr. Force took from his -- that individual's digital currency

3   accounts after there had been this murder for hire staged,

4   that that individual had in fact been killed.

5       And this is reflected in the government's --

6           THE COURT:  Which didn't actually happen.

7           MS. HAUN:  Correct, Your Honor.  Didn't actually

8   happen.  This is reflected in the government's sentencing

9   memo, where the government discusses about how Mr. Force

10  helped himself to Mr. Green's Dwolla and other accounts,

11  Your Honor.

12          THE COURT:  And you have seen discovery to support

13  that?

14          MS. HAUN:  I have, Your Honor.  With the Court's

15  indulgence, may I just confer with one of the agents?

16          THE COURT:  Sure.

17          MS. HAUN:  Thank you.

18      (Off-the-Record discussion between counsel and Probation

19  Officer)

20          MS. HAUN:  Your Honor, I was -- I was correct about

21  the Dwolla account.  It is -- we have seen discovery, we have

22  provided discovery on that to Mr. Bates and to the Probation

23  Officer.

24          THE COURT:  Okay.

25          MR. BATES:  I'll say Your Honor, I must have
```

1  overlooked that.  I thought there was $3,000 cash they were

2  trying to say that was taken off his person.

3        **THE COURT:**  Oh.  That is not the case.

4        **MR. BATES:**  That is not the case.  Then, I will

5  remove that objection, Your Honor.

6        **THE COURT:**  All right, so the C.G. restitutionary

7  amount will remain at 3,000.  So the total of restitution that

8  I'm ordering is $340,000, as reflected in the materials that I

9  received from the Probation Department.

10      Going back to the imposition of sentence, when

11  incarcerated, payment of restitution is due during

12  imprisonment at the rate of not less than $25 per quarter, and

13  payment shall be through the Bureau of Prisons Inmate

14  Financial Responsibility Program.

15      Restitution payment shall be made to the Clerk of the U.S.

16  District Court, Attention:  Financial Unit, 450 Golden Gate

17  Avenue, Box 36060, San Francisco, California, 94102, in

18  monthly payment of not less than $500 or least 10 percent of

19  earnings, whichever is greater, to commence no later than 60

20  days from placement on supervision.

21      Any established payment plan does not preclude enforcement

22  efforts by the U.S. Attorney's office, if the Defendant has

23  the ability to pay more than the minimum due.

24      Forfeiture, there's -- I won't go through the many code

25  lines and numbers, but I will direct all concerned to Page 6

1  of the PSR and that has a list of items, A through K, which

2  are to be ordered forfeited.  And I want you to look at that,

3  so you all have it in front of you.

4      And that then brings me to the question of where the

5  37,000 that we were discussing before is reflected on this

6  forfeiture list.

7          **MS. HAUN:**  Your Honor, what page did you say?

8          **THE COURT:**  Page 6 of the PSR.

9          **MS. HAUN:**  Okay.

10  (Off-the-Record discussion between counsel and Probation

11  Officer)

12          **MS. HAUN:**  Your Honor, this is going to require me

13  conferring with one of the case agents because I -- I know

14  where it comes from, it comes from the R.P. transfer.  But I'm

15  not sure which one of these Bitcoin addresses include that.

16          **THE COURT:**  Okay, let me just make it clear what I

17  want, and then you can -- when we're putting together the

18  judgment and commitment order you can adjust it, we can adjust

19  it accordingly.

20      But so the record is clear, I'm ordering forfeiture as

21  reflected on Page 6 of the presentence report.  However, we

22  are going to adjust that list because one of these items

23  includes, as I'm advised, the $37,000 that has now been

24  included in the restitution amount.  And so I'm going to

25  deduct that amount from the appropriate line in this

1  forfeiture list.

2  　　Understood?

3  　　　**MS. HAUN:**  I understand, Your Honor.  We will handle

4  that, and we will advise your courtroom deputy --

5  　　　**THE COURT:**  Right.

6  　　　**MS. HAUN:**  -- on the J&C.  There is one thing.  If in

7  fact I'm mistaken, and our Asset Forfeiture Unit wants the

8  other method Your Honor proposed, for it to not adjust the

9  forfeiture but to effect the restitution --

10 　　　**THE COURT:**  No, we are adjusting the forfeiture.

11 　　　**MS. HAUN:**  Okay.

12 　　　**THE COURT:**  It's done.  So they can adjust.  Okay?

13 　　Mr. Force, in the plea agreement that you entered into, in

14 Paragraphs 4 and 5 of that agreement, there is language

15 indicating that you have given up your -- the bulk of your

16 appellate rights, with the reservation that you preserve

17 appellate rights for a claim of ineffective assistance of

18 counsel with respect to this proceeding and imposition of

19 sentence.

20 　　Not commenting on whether or not you have any appellate

21 rights remaining, if you do elect to file a notice of appeal,

22 you would have to do that 14 days from the entry of judgment.

23 Understand that?

24 　　　**THE DEFENDANT:**  Yes.

25 　　　**THE COURT:**  All right.  Anything further?

1          **MS. HAUN:**  No, Your Honor.

2          **THE COURT:**  Thank you.

3          **MR. BATES:**  Thank you, Your Honor.

4      (Conclusion of Proceedings)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Thursday, November 19, 2015

Belle Ball, CSR 8785, CRR, RDR